DREW, J.
11 After a 2012 auto-pedestrian accident, the plaintiffs brought this lawsuit seeking damages for personal injuries, including Lejeune[1] damages, against the defendants. After various settlements and dismissals, the case went to a bench trial, where the remaining issues were the fault of the driver, whether Lejeune damages were proven, and the primary insurer’s responsibility for the Lejeune damages. The trial court found the driver to be solely at fault for the accident and that the bystander suffered Lejeune damages, and concluded that the driver’s insurer had to pay the Lejeune damages. The driver and insurer appeal; we affirm.
FACTS
Just after 7:00 p.m. on February 19, 2012, Fran Smith and her 14-year-old daughter Kelise were walking home from church southbound along the west side of University Avenue in Monroe. This two-lane road does not have a sidewalk or a paved shoulder; instead, the area beyond the edge of the paved road is a mixture of gravel and grass. The grassy shoulder is sloped downward from the road toward a drainage culvert. The Smiths, who had walked along this road many times before, were walking single file with Kelise in front of Fran, but they were close enough to each other to cany on a conversation. Because they were on the west side of the road, the traffic nearest them approached them from behind. This area is unlit by streetlights.
Robert Thomas, driving a 2000 Toyota Camry, was driving southbound on University Avenue at the same time. When he reached the | ^Smiths, the right side of the Camry struck Fran Smith, throwing her into the ditch and knocking her briefly unconscious. Kelise ran to her mother’s side and observed that she was not responsive and appeared to be foaming at the mouth.
In the meantime, Thomas stopped his car on the other side of the road. Kelise approached Thomas and screamed and cursed at him, believing that he had killed her mother.
Police and EMS responded to the scene. Smith had regained consciousness and had serious cuts on her head and hand; she spent at least one night in the hospital.
Monroe PD Officer James Varnell investigated the accident and spoke with the parties. His report[2] states, in part:
*948 [Mr. Thomas] stated he was southbound on University when [Fran Smith] suddenly appeared walking' southbound on the edge of the roadway. Driver stated he then struck the pedestrian. I then spoke with the pedestrian’s daughter, Kelise Smith, who stated she and her mother Fran Smith were walking southbound on University on the right hand side of the road when Fran was struck from the rear by vehicle 1. Kelise added that Fran was thrown into the air and she landed approximately 20 feet from the impact site.
The officer did not issue either party a citation as a result of the crash.
In February 2013, Fran Smith and her husband, Troy, filed suit individually and on behalf of the then-minor Kelise, against:
• Robert Thomas, the driver;
• Cheryl Huey, the owner of the Canary;
• State Farm Mutual Automobile Insurance Company (“State Farm”), the liability insurer for the Canary;
• Direct General Insurance Agency, with whom the Smiths had a liability policy with UM coverage; and
|s« Financial Indemnity Company, with whom the Smiths also had a liability policy with UM coverage.
Their petition alleged that Fran and Kelise were walking on the shoulder and the accident occurred when Thomas veered off of the road onto the shoulder and hit Fran. In its answer, State Farm denied that the ladies were walking on the shoulder and asserted that they were walking on the roadway.
In March 2014, the plaintiffs settled their claim against Thomas, Huey, and State Farm, reserving Kelise’s Lejeune claim against these defendants.[3] Thomas’ policy with State Farm had 15/30 limits, and State Farm paid the plaintiffs $15,000. Thereafter, State Farm sought summary judgment on Kelise’s Lejeune claim. The insurer did not argue that its policy provided no coverage for Lejeune claims. Instead, the insurer urged that the settlement payment of $15,000 had exhausted the “per person” limit of Thomas’ policy and Kelise’s Lejeune claim did not trigger the remaining “per accident” limit because she suffered no physical injury during the crash. State Farm relied on the language of its policy, which provides:
The limit shown under “Each Person” is the most we will pay for all damages resulting from bodily injury to any one person injured in any one accident, including all damages sustained by other persons as a result of that bodily injury. The limit shown under “Each Accident” is the most we will pay, subject to the limit for “Each Person”, for all damages resulting from bodily injury to two or more persons injured in the same accident.
[[Image here]]
[Bodily injury is] physical bodily injury to a person and sickness, disease, or death that results from it.
Emphasis in original.
1 ¿State Farm argued that Kelise’s Le-jeune claim was not the result of “physical” bodily injury because Thomas’ car did not strike Kelise in the accident. In opposition, plaintiffs urged that material facts remained in dispute and the Lejeune claim was a direct result of the accident and not derivative of another’s claim, so jurisprudence on derivative claims limiting per accident recovery was inapplicable. That mo *949 tion was heard and denied by the trial court in August 2014, and this Court denied writs.[4]
The case went to trial in October 2015; there were four live witnesses: Troy, Fran and Kelise Smith, and Robert Thomas.
Robert Thomas testified:
• He was driving the 2000 Toyota Camry southbound on University Avenue on the night of the crash;
• There were two vehicles in front of him. The first was driven by his sister-in-law, who was now deceased, and the second was a work truck driven by an unknown person;
• He was following the work truck closely, approximately a car length behind it, driving in the middle of the lane, going about 20 mph;
• He was familiar with the road and drives it routinely because he lives nearby;
• He had seen pedestrians in the area before as there was a city bus stop nearby, and his wife had previously walked on the shoulder of University Avenue to get to the college;
• It was dark, but not pitch dark, at the time of the accident, but there were no street lights;
• He did not see Fran Smith before hitting her, and initially after hearing the sound of the impact, he did not know that his car had hit a person;
• The work truck in front of him did not have to swerve to miss Fran Smith, nor did the car driven by his sister-in-law;
Ib» He did not swerve, run off of the road, or cross the white fog line before hitting Fran Smith;
• Two parts of the Camry hit Fran Smith: the right front and the passenger side mirror, and the impact broke the blinker lens and the right side mirror off of the car;
• After the crash, Fran Smith was lying in a ditch just south of a driveway;
• Fran was wearing grey and black clothing;
• After he stopped his ear, Kelise came over to him, screaming and cursing at him saying that he had killed her mother;
• He told the investigating officer that he never saw Fran Smith before hitting her; and
• He believed that the impact happened while Fran and Kelise were standing on the driveway near where Fran was thrown, but he did not run off the road onto the driveway.
Troy Smith testified:
• He is Fran Smith’s husband;
• At the time of the accident, they lived on University Avenue, and he was at home;
• He became aware of the accident when Kelise called him, and he said that Kelise was “screaming” and “frantic,” so he drove to the scene;
• He beat the paramedics to the scene, where he saw Fran lying on her back, semiconscious, “foaming and just mumbling a little bit,” and Kelise was “crying,” “hysterical” and “all over the place”;
• Fran was on the driveway, not in the ditch;
• During the ride to the hospital, Kelise continued to cry, was “praying and just upset,” and Fran spent at least two nights in the hospital;
*950 • Kelise missed one or two days of school because of the accident, and continued to make As and Bs, but quit the dance team because of the accident;
|fi* After the accident, Kelise “wasn’t herself,” and “just wanted to be alone or with Fran” instead of her friends, so Troy asked his brother-in-law, Reverend Alonzo Clark, to counsel Kelise;
• The family did not send Kelise for professional counseling because “I really didn’t understand it” and because they did not have the finances to do that;
• Kelise “didn’t really want to talk” about the accident and didn’t tell him any details, and she would just “shut down”; and
• About six months after the accident, the family moved to Texas for work, and Kelise was continuing to have problems related to the accident.
Fran Smith testified:
• At the time of the accident, the family lived on University Avenue;
• She had no recollection of the actual impact;
• Prior to the accident, she and Kelise had been at church and were hurrying home so she could go for a walk before it became dark;
• Kelise was walking in front of her to the right of University Avenue;
• They were never at any time walking “in the lane of traffic or in the roadway,” because “when Kelise and I started out, I said ‘make sure you get on the side.’ And she say, ‘you always say that, mama.’ And we laughed about it, you know”;
• Although there are no shoulders beside University Avenue, “there is room to walk off where we walk. There is room to walk off of the road on the dirt, on the grass”;
• She was wearing a grey sweater, black sweat pants, and black shoes with orange reflectors;
• She didn’t recall how long she spent in the hospital, and said that Kelise missed one day of school;
• After the accident, Kelise became “distant” and “[s]he wasn’t sparkle. She ... wanted to be by herself in her room. She didn’t want to be active. Kelise was always active in school. She was getting the—her eighth grade year was getting ready to be over with and we had already discussed her going to try out |7for cheerleader when she entered into the ninth grade. She didn’t want to do any—any of that anymore.” ... “[S]he just wasn’t my Kelise. She was just shutting down, and I could see it. I knew that the experience of her seeing me being hit by a car was devastating to her. But I just—I thought that that—you know, it was going to take time. But she didn’t even want to discuss to me my—the state I was in when I was hit by the car”;
• Kelise would cry and sob around Fran but didn’t want to talk about the incident, and Kelise began to have bad dreams that led her to have her mother sleep in the room with her, and that these incidents still continued, “even now,” though Kelise was now 18;
• Kelise “didn’t want anything to do with her friends” after the accident;
• Kelise maintained her A and B average grades, but did not want to participate in the school dance team the year after the accident; and
• Kelise did not see a medical professional about her issues but was coun *951 seled by the associate pastor at their church and the school counselor at her high school was made aware of the issue.
Kelise Smith testified:
• She was 14 at the time of the accident;
• She was walking in front of her mother “on the gravel” on the side of University Avenue;
• They had walked on this road on multiple occasions before. Kelise said that a recent picture[5] of the area taken in 2015 did not accurately depict the shoulder of the road as it was in 2012 because in the recent photo, “the right side of the fog line, it’s like—it’s not as much—it’s gone, like the grass and all that, it’s gone more. In 2012, it was more room to walk, more grass and gravel”;
• Her mother was behind her but within arm’s reach, and they were talking as they walked, and Kelise was looking forward, not toward her mother;
Is* She was walking off of the roadway, on the opposite side of the white fog line, and was sure that her mother was also because “she always walked on the gravel and the grass”;
• Describing the accident: “Well, there was a car and it was—it came out of nowhere. And it was like somebody had jumped out of the window. And I had turned around to grab my mom and she wasn’t there, so I figured like that must have been my mom, like, getting hit. So I ran to the person that was laying on the ground. And that’s when I knew it was my mom”;
• She could not say that Thomas veered off of the road at the time of the crash because she was not looking backward;
• When Kelise went to her mother, Fran “was unconscious and she was ... foaming at the mouth. And she was shaking. And I was trying to calm her down and like wake her up and she wasn’t coming to.” “She had a big gash on the top of her head. And she had a scar on her hand. It was a bad cut. And she was bleeding”;
• Kelise initially thought that her mother was dead;
• She screamed and cursed at Thomas, something she had never done before, because she thought he had killed her mother, but later apologized after Fran regained consciousness;
• She missed only one day of school, and maintained her A and B average, but started having trouble sleeping and began to have nightmares;
• She spoke with her uncle Alonzo Clark, an associate pastor, about her issues, and did so “every day of the week” until the family moved to Texas in August 2012, and thereafter spoke with him by phone and in person on weekend trips;
• Since the accident, she had become more quiet and distant, she had become more protective of her mother, and she exercised only on a track, not on the street;
• Her nightmares were only occasional at the time of trial; and
*952 • She decided not to participate in the school drill team during her freshman year of high school partly because of her mother’s accident.
The court took the case under advisement, and on January 6, 2016, issued reasons for judgment, finding that the plaintiffs had proven that | aRobert Thomas was solely at fault for the accident, that Kelise had suffered damages compensable under La. C.C. art. 2315.6, and that Kelise was entitled to recover $12,000 under a second “per person” limit, i.e., the “per accident” limit, of the State Farm policy. Rather than repeat the judge’s reasons, we have attached a copy of those reasons to this opinion for the reader’s use.
In response to a judgment rendered in conformity with the reasons, State Farm filed a timely motion for new trial, arguing that the trial judge erred in concluding that Kelise’s damages could be paid from the State Farm policy because the damages were not derivative of her mother’s injuries. The trial court held a hearing on the motion and heard extensive argument, but ultimately concluded that its ruling was not solely constrained by the “derivative” determination and maintained that the per-accident limit of State Farm’s policy applied to Kelise’s damages. Thereafter, State Farm and Robert Thomas took sus-pensive appeals.
DISCUSSION

Robert Thomas’ Assignment of Error 1. The District Court committed manifest error by erroneously finding that Robert Thomas was solely at fault in causing the subject accident,

Thomas’ first assignment of error challenges the tidal court’s conclusion that he was solely at fault for the accident. He argues that all of the fault should be allocated to Fran Smith, or at least the overwhelming majority of it.
In Endsley v. Pennington, 31,027, (La.App. 2d Cir. 9/29/98), 718 So.2d 650, this Court explained:
When a motor vehicle strikes a pedestrian, the case is properly governed by comparative fault principles. LSA-C.C. art. 2323; Hundley v. Harper Truck Line, 28,613 (La.App. 2 Cir. 9/25/96), 681 So.2d 46. Several factors are considered in comparing the relative fault of the parties, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, either superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985). An appellate court may not set aside a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La. 1993). Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Stobart, supra. The allocation of fault is also a factual determination subject to the manifest error rule. Hundley, supra.
After a careful review of the entire record, including the police report, testimony of the witnesses, and the various photographs introduced into evidence, we detect no manifest error in the trial court’s allocation of fault. The trial court’s determination of fault was based in part upon a credibility determination. The judge noted:
*953 • Thomas evidently told the police officer that Fran was walking in the road, but he testified at trial that he did not see Fran before hitting her,
• Thomas testified that he was traveling one car length behind the work truck in front of him, but this truck neither hit Fran nor had to swerve to avoid hitting her, so Thomas had to have been driving to the right of the path of the truck.
Defendant makes much of the testimony of Fran and Kelise that neither of them saw Thomas driving erratically or cross over the fog line, but both of these witnesses also testified that they were walking on the thin strip of grass and gravel beside, not on, University Avenue. This was a path that both had walked on many times before, and both testified about their usual care in keeping to the path and not walking on the road. For that ^reason, we find La. R.S. 32:216(B)[6] essentially inapplicable, as we find no manifest error in the trial court’s decision to credit Fran and Kelise’s testimony that they were “walking on the grass and gravel on the side of the road” or on a driveway that intersected the road, not on the road surface.
Although the investigating officer found no evidence that Thomas had run off the road, we also note that there are no contemporaneous photos of the accident scene and, indeed, the location of the accident itself was somewhat contested. Given the testimony of the persons who were at the scene, including that of Thomas who said he did not know where Fran was when he hit her, we find no error in the trial court’s choice not to credit the officer’s conclusion that Fran was in the road at the time of the crash.
Robert Thomas’ Assignment of Error 2. The District Court committed manifest error by erroneously finding that Appellee carried her burden of proof to show that she suffered severe and disabling mental and / or emotional anguish as a result of the subject accident.
State Farm Assignment of Error 2. The District Court committed manifest error by erroneously concluding Appellee carried her burden of proof to show she suffered “severe, debilitating” mental anguish and / or emotional distress as a result of the subject accident.
Both Thomas and State Farm contend that the trial court’s award of Le-jeune damages to Kelise was an error because, they assert, Kelise failed to prove that her injuries were severe and debilitating under La. C.C. art. 2315.6, which provides, in part:
B. To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant’s position to suffer serious mental anguish or emotional distress from the experience, and the claimant’s mental anguish or emotional distress must be severe, debilitating, and foreseeable.
| 12The appellants cite the following evidence in support of their assignments of error:
• Kelise saw her mother unconscious for only a minute;
• Kelise missed only one day of school;
• Kelise did not seek professional/medical treatment or therapy but only received counseling from her uncle;
*954 • Kelise maintained an A and B average at school and passed the LEAP test;
• She missed one year of dance line at school, which was partly due to her move; and
• She planned to attend college in the future.
For all of these reasons, the appellants argue that the trial court was manifestly erroneous in finding that Kelise’s injury was compensable.
The trial court readily concluded that Kelise’s injuries were foreseeable and severe, but in determining whether Kelise was debilitated, the judge was mindful of these facts, stating:
• She missed only one day of school, and maintained her A and B average;
• She stopped dancing in the school dance line, but this was not solely due to the accident;
• She had bad dreams every night for a while after the accident and sometimes had to sleep with her mother or older sister;
• She continued to fear that her mother might die and is more protective of her now;
• Kelise said that this was the most traumatic event of her life;
• Kelise did not attend counseling with a professional but instead talked with Rev. Clark for a number of months; and
• Credible testimony showed that Kelise was “not the same,” was more reserved, did not want to be active, wanted to stay in her room, and became more distant.
| iaBased on all of these factors and hearing the testimony of the witnesses, the judge concluded that Kelise’s injuries were debilitating. Although we recognize that the objective criteria of good school attendance and good grades tend to discount the debilitating nature of this incident, we nevertheless find no error in the trial court’s conclusion. Both Kelise’s mother and father reported that after the accident, Kelise was simply “not the same” joyful child that she had previously been; they said that she wanted to stay in her room and not interact with friends or others, and that she continued to have nightmares for years after the event. Kelise’s ability to maintain good grades in school goes more to the extent of the debilitating injury rather than its existence. The evidence shows that she was able to overcome some of the injury caused by the event but does not disprove the debilitating effect of the incident. The trial court took all of these things into consideration as well when making the not overly large $12,000 award of damages for Kelise.
State Farm Assignment of Error 1. The District Court committed legal error in concluding a separate “per person” bodily injury coverage limit applied to the emotional distress / mental anguish claims asserted by Appellee, Kelise Smith.
State Farm’s other contention in this appeal is that Kelise’s Lejeune damages did not trigger the additional per person limit in Thomas’ policy. In other words, the insurer is contending that the policy’s language limited the Smiths to a single “per person” limit because Kelise did not suffer “physical” injury in the accident, and because State Farm has already paid the Smiths the $15,000 per person limit, the additional $15,000 per accident limit is not available to them.
As noted above, the State Farm policy in this case provides:
114The limit shown under “Each Person” is the most we will pay for all damages resulting from bodily injury to any one *955 person injured in any one accident, including all damages sustained by other persons as a result of that bodily injury. The limit shown under “Each Accident” is the most we will pay, subject to the limit for “Each Person”, for all damages resulting from bodily injury to two or more persons injured in the same accident.
[[Image here]]
[Bodily injury is] physical bodily injury to a person and sickness, disease, or death that results from it.
The insurer contends that the trial court misinterpreted this policy and mistakenly relied upon the non-derivative nature of Lejeune injuries to extend the State Farm policy beyond its terms. We note that this is a question of law, so this Court’s review of the trial court’s ruling is de novo.
An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. Louisiana Ins. Guar. Ass’n. v. Interstate Fire & Cas. Co., 93-0911 (La. 1/14/94), 630 So.2d 759, 763. If the words of the policy are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent and the agreement must be enforced as written. Smith v. Matthews, 611 So.2d 1377, 1379 (La. 1993). An insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. LIGA, supra, at 763. If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer who issued the policy and in favor of the insured. Id. at 764.
Several reported cases have considered related questions. In Crabtree v. State Farm Ins. Co., 93-0509 (La. 2/28/94), 632 So.2d 736, the Supreme [1fiCourt considered whether, under the terms of the policy at issue there, a Lejeune claim amounted to bodily injury as defined. In that case, Mr. Crabtree was riding a motorcycle in front of a car -driven by his wife; an oncoming car crashed into Mr. Crabtree, seriously injuring him. Although Mrs. Crab-tree was not involved in the impact, she witnessed the accident and the terrible injury to her husband and suffered Le-jeune damages. State Farm, which insured the oncoming at-fault motorist, paid the Crabtrees $25,000 under the 25/50 policy. However, State Farm argued that its policy did not allow Mrs. Crabtree a separate recovery under the $50,000 aggregate limit for her Lejeune damages. In Crabtree, the policy specified:'
The amount of bodily injury liability coverage is shown on the declarations page under “Limits of Liability—Coverage A—Bodily Injury, Each Person, Each Accident”. Under “Each Person” is the amount of coverage t$25,000] for all damages due to bodily injury to one person. “Bodily injury to one person” includes all injury and damages to others resulting from this bodily injury. Under “Each Accident” is the total amount of coverage [$50,000], subject to the amount shown under “Each Person”, for all damages due to bodily injury to two or more persons in the same accident.
The Supreme Court also explained:
The policy defines “bodily injury” as “bodily injury to a person and sickness, disease or- death which results from it.”
Although the trial court and the court of appeal concluded that Mrs. Crabtree was not entitled to recover under, the aggregate limit, the Supreme Court disagreed, stating:
*956 To determine the amount of State Farm’s liability, we must interpret the insurance policy to decide three issues: (1) whether the policy language defining “bodily injury to one person” to include “all injury and damages to others resulting from this bodily injury” encompasses Mrs. Crabtree’s mental anguish; (2) whether Mrs. Crabtree’s mental anguish constitutes “bodily injury” as defined in the policy; and (3) whether Mrs. Crab-tree suffered her mental anguish “in the same accident” as that which caused Mr. Crabtree’s bodily injuries. If “bodily injury to one person” encompasses Mrs. Crabtree’s mental anguish, then State Farm’s liability is limited to the $25,000 policy hfilimit for “all damages due to bodily injury to one person.” If not, and if Mrs. Crabtree’s mental anguish constitutes “bodily injury” suffered “in the same accident,” then State Farm is liable under the $50,000 aggregate policy limit for “all damages due to bodily injury to two or more persons in the same accident.”
The Court decided that the second inquiry answered the first:
As illustrated by the foregoing hypothet-icals, State Farm’s construction of the policy language defining “bodily injury to one person” strains the meaning of the policy language, respectively enlarges and restricts the separate policy provisions beyond what is reasonably contemplated by the terms, and achieves an absurd result. If State Farm had intended “bodily injury to one person” to include” all injury, including bodily injury, and damages to others resulting from this bodily injury,” the policy would have so provided. Moreover, State Farm’s interpretation construes the “resulting from” clause in isolation at the expense of disregarding the clear and explicit language defining the aggregate coverage for “Each Accident” as “all damages due to bodily injury to two or more persons in the same accident.”
Emphasis added. The Court further concluded that Mrs. Crabtree’s Lejeune damages amounted to bodily injury under the policy definition:
The definition is ambiguous in at least two respects. First, the definition is circular in that the term being defined is used within its own definition: “Bodily injury is bodily injury to a person, and sickness, disease or death which results from it.” Secondly, if the definition was intended to cover only external, physical injuries, then “bodily injury” easily could have been defined in a more restrictive fashion through the use of such words.
Moreover, interpretation of the term “bodily injury” to include Lejeune damages is consistent with the jurisprudence of this court. In Lejeune, 556 So.2d at 570, we made it clear that in order to be compensable, mental pain and anguish suffered because of injury to a third person must be “both severe and debilitating.” We pointed out that “fojther states have recognized that [t]he essence of the tort is the shock caused by the perception of the especially horrendous event.” Id. at 570 [(internal citations omitted) ]. Additionally, although not having to do with the interpretation of a policy definition, it is nonetheless instructive to note that in Sparks v. Tulane Medical Center Hospital & Clinic, 546 So.2d 138, 146 (La. 1989), we interpreted the phrase “physical structure of the body” as it is used in the Worker’s Compensation Act to include injuries to the mental health of an employee.
117Notably, the policy in Crabtree defined “bodily injury” without the additional modifier of “physical bodily injury” that is used in the policy in this case.
*957 In Hill v. Shelter Mutual Ins. Co., 2005-1783 (La. 7/10/06), 935 So.2d 691, the court addressed a similar issue. Mr. Donald Cannon was a guest passenger in a car driven by his wife. The car was involved in an accident, and Mr. Cannon was killed. The car was insured by Shelter Mutual. Three of Mr. Cannon’s children sued Cannon’s wife and Shelter. These were wrongful death claims, not Lejeune claims. The insurer argued that the children’s recovery was limited by the per person, not the per accident, limit of the Shelter policy, which defined “bodily injury” using the same language that the policy in Crabtree used.
The trial court in Hill allowed the plaintiffs to recover under the per accident limit of the Shelter policy, but the court of appeal reversed, limiting their recovery to the per person limit. The Supreme Court reversed the court of appeal and allowed plaintiffs a potential recovery under the per accident limit, stating, among other things:
The Shelter policy at issue defines bodily injury using the same language as did the policy at issue in Crabtree, and, as we previously determined in Crabtree, that language is ambiguous and will be construed so as to provide coverage.
Had Shelter desired to limit its liability for “bodily injuries” to others, it could have done so by using the language we recommended in Crabtree: “Bodily injury” sustained by one person includes all injury, including bodily injury, and damages to others resulting from this bodily injury. Fn.2. Shelter failed to do so.
Fn. 2. We do not imply that this language is the only possible language which would limit liability.
11sThe Supreme Court ultimately remanded the case for a determination of whether the plaintiffs’ injuries were sufficiently severe so they could be considered “bodily injury” within the meaning of the policy.
In Hebert v. Webre, 2008-0060 (La. 5/21/08), 982 So.2d 770, the Supreme Court considered a similar issue in a survival action/wrongful death case. After Christopher Hebert was killed in a car crash, his widow[7] filed suit against, among others, the Heberts’ UM carrier, State Farm. The Heberts had a 100/300 policy with UM coverage, and State Farm paid $100,000 to the Heberts. The insurer argued that it was not obligated to pay more than the single “per person” limit of the policy because of the policy language limiting the applicability of the “per accident” limit. The trial court and the court of appeal agreed with the plaintiffs, but the Supreme Court granted writs and reversed, finding that the language limited the plaintiffs to one “per person” recovery. The State Farm UM policy provided the conditions under which payment will be made under the UM portion of the policy:
We will pay nonpunitive damages for bodily injury an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle. The bodily injury must be sustained by an insured and caused by accident arising out of the operation, maintenance, or use of an uninsured motor vehicle.
The policy defined “bodily injury” as:
[Pjhysical bodily injury to a person and sickness, disease or death which results from it.
Finally, the policy explained the distinction between the “each person” limit and the “each accident” limit:
| inLimits of Liability Under Coverage U The amount of coverage is shown on the declarations page under “Limits of Lia *958 bility—U—Each Person, Each Accident.” Under “Each Person” is the amount of coverage for all damages due to bodily injury to one person. “Bodily injury to one person” includes all injury and damages to others resulting from this bodily injury, and all emotional distress resulting from this bodily injury sustained by other persons who do not sustain bodily injury. Under “Each Accident” is the total amount of coverage, subject to the amount shown under “Each Person”, for all damages due to bodily injury to two or more persons in the same accident.
The Supreme Court closely examined the policy language in Crabtree and Hill, supra, and found notable differences:
• In the earlier cases, “bodily injury” was defined as “bodily injury to a person and sickness, disease and death which results from it” whereas the policy in Hebert defined the term as “physical bodily injury to a person and sickness, disease or death which results from it” (emphasis added),
• In Crabtree and Hill, “bodily injury to one person” was defined to include “all injury and damages to others resulting from this bodily injury.” The Hebert State Farm policy defined “bodily injury to one person” to include “all injury and damages to others resulting from this bodily injury, and all emotional distress resulting from this bodily injury sustained by other persons who do not sustain bodily injury” (Emphasis added).
Hebert, like Hill, was a wrongful death/survival action case, not a Lejeune case. As the Court stated:
As we explained in Hill, the type of injuries suffered by a wrongful death plaintiff are emotional distress type injuries. In addition, under the terms of this policy, even if “bodily injury” could be interpreted to include emotional distress which manifests itself physically, the policy includes “all emotional distress damages” in the “Each Person” limit, not just ones that do not manifest themselves physically or do not rise to the level of severe and debilitating. Further, in a wrongful death action, the plaintiffs who suffer this emotional distress are “other persons who do not sustain bodily injury,” because a “bodily injury” under this policy is a “physical bodily injury,” which does not include emotional distress.
12nThe Court explained another difference between Crabtree and the later cases:
Finally, another distinction from Crab-tree is found not in the policy language, but in the particular facts of that ease. Under both the policy in Crabtree and in this case, in order for the for the “Each Accident” aggregate limit to apply, two or more persons must suffer bodily injury “in the same accident.” The wife in Crabtree was found to have suffered bodily injury “in the same accident” with her husband because she actually witnessed her husband being “violently struck and severely injured by an oncoming car.” 632 So.2d at 745. Here, Hebert’s wife and children did not suffer bodily injury “in the same accident” with him as they were not in the car, nor anywhere near the accident.
Considering the similarities and differences between the policy language and the nature of the claims in Crabtree, Hebert, and the instant case, we conclude that the “each accident” limit, rather than the “each person” limit, in the State Farm policy in the instant case applies to cover this loss. Although the policy in this case does define “bodily injury” as “physical bodily injury” as did the policy in Hebert, *959 the decision in Hebert did not rest solely upon that language and we do not believe that the Supreme Court meant for that language alone to control. This is a Le-jeune case, not a wrongful death or survival action case. As explained in Crabtree, “interpretation of the term ‘bodily injury’ to include Lejeune damages is reasonable and consistent with the jurisprudence of this court.” Although the Hebert decision said “even if ‘bodily injur/ could be interpreted to include emotional distress which manifests itself physically,” the court did not go so far as to reverse Crabtree and that case’s recognition that Louisiana has a long jurisprudential history of treating Le-jeune damages as bodily injury.
Further, the policy in Hebert expressly stated in the “each person” limit description that “all emotional distress damages” were included within Li that limit, not the “each accident” limit. That language is conspicuously absent in the “each person” limit applicable in this case. Although we believe that Lejeune damages are more akin to “bodily injury” than “emotional distress damages,” we nevertheless find the omission of “emotional distress damages” to create additional ambiguity in the terms of the policy.
Lastly, as happened in Crabtree and not in Hebert, Kelise suffered her damages “in the same accident” that injured her mother. Again, the policy in this case states in part:
The limit shown under “Each Accident” is the most we will pay, subject to the limit for “Each Person”, for all damages resulting from bodily injury to two or more persons injured in the same accident.
Emphasis added. Thus the “each accident” limit could not have applied in Hebert, as the Supreme Court recognized when it noted that Mr. Hebert’s children were not in the car or anywhere near the accident. That is not the case here; Kelise was walking approximately an arm’s length in front of her mother when Fran was struck by the car. Kelise was plainly injured “in the same accident” as Fran.
DECREE
For all of these reasons, we affirm the judgment of the district court in its entirety. Costs of this appeal are assessed equally to each appellant.
AFFIRMED.
APPENDIX
STATE OF LOUISIANA * PARISH OF OUACHITA * FOURTH DISTRICT COURT
FRAN SMITH, ETAL
VERSUS
ROBERT THOMAS, CHERYL HUEY, and STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ET AL
NO. 13-0507
FILED: January 6, 2016

M

DEPUTY CLERK OF COURT
REASONS FOR JUDGMENT
|! This is a suit for damages filed by. FRAN SMITH and TROY SMITH, husband and wife, individually and on behalf of their minor child, KELISE SMITH, who turned 18 prior to trial and now represents herself. All counsel agreed that no amendment to the petition would be required for her to do so.
The defendants named in the petition are ROBERT THOMAS, driver of the car that struck FRAN, and the owner of the 2000 Toyota Camry car he was driving, CHERYL HUEY.
State Farm Automobile Insurance Company, insurer of Cheryl’s car, was next *960 named as a defendant, followed by Direct General Insurance Agency, the underin-sured motorist (UM) Company on a policy issued to TROY SMITH. Finally, Financial Indemnity Company, UM insurer on a policy issued to FRAN SMITH, was named.
In the course of the litigation, settlements and dismissals have reduced the claims and defenses in dispute to the point where the only issues to be addressed in this opinion are the fault of FRAN and the bystander damage claims of KELISE, defended against by Robert Thomas, who is represented by Attorney Douglas Wheeler and State Farm. The stacking concern raised by Direct General is disposed of by this opinion.
In each of the dismissals, all claims by FRAN and TROY were dismissed, except for Financial Indemnity Company, where the claim on the part of KELISE for Lejeune damages was also dismissed. However, KELISE’S Lejeune claim was reserved.
The fault issue will be addressed in the discussion below.
The Plaintiffs alleged in their petition that on February 19,2012, at approximately 7:05 p.m., FRAN was walking South on the shoulder of University Avenue in the City of Monroe, Louisiana, accompanied by her daughter, KELISE SMITH, who was walking in front of her.
They allege that the car driven by defendant Robert Thomas was also traveling southbound on University Avenue, when it veered off the roadway and struck FRAN as she was walking, causing a sudden and violent collision of the car with her. They allege that Fran was hit | ¿from behind, and propelled 20 feet through the air, injuring her severely and rendering her unconscious.
The accident report is in evidence as Exhibit DG-2. It shows that University Avenue is a two-way street that is straight and level. The weather was clear. The investigating officer wrote that the Avenue had a “street light at intersections only.”
The officer talked to defendant Thomas who told him that he was Southbound on University Avenue when pedestrian 1 “suddenly appeared walking Southbound on the edge of the roadway.” Pedestrian 1 is FRAN. Note that the photographs in evidence show that there are no sidewalks on either side of the street in that area of University, and there were none when this accident occurred over three and a half years before trial.
The accident report shows that the officer also talked to KELISE at the scene, who told him that she and her mother, FRAN, were walking Southbound on University on the right-hand side of the road, when FRAN was struck from the rear by Vehicle 1, which was the vehicle defendant Thomas was driving. KELISE further told the officer, according to his report, that her mother was thrown into the air and landed approximately 20 feet from the impact site.
The Court here notes that, for some reason, the officer filed a Supplemental Report on March 3, 2012, nearly two weeks after the accident. Statements made in this Supplement will not be considered as requested at the time the parties stipulated that the report could be entered in evidence as an Exhibit. The trial testimony of defendant Thomas is in conflict in significant particulars with his earlier statement. The story of how this accident happened is perhaps best told by starting with reporting the trial testimony of defendant Thomas, who was the first witness.
*961 TESTIMONY OF ROBERT THOMAS
Defendant Thomas testified that on February 19, 2012, he was driving in a Southerly direction on University Avenue going to pick up his wife; he said he was not late. He said there were two vehicles ahead of him. The first vehicle was being driven by a relative who has since died. He described the next vehicle as a work truck. He said it was getting dark at the time of the accident, but not pitch black.
Defendant Thomas said he did not see FRAN before he struck her, and does not know where she was when his car hit her. He said there was noise from the impact and that FRAN’S body hit the car in two places, namely, at the right front headlight area, where there was already | ¡¡damage, see Exhibit Thomas 5, and that her second impact with the ear broke off the right side view mirror completely.
Defendant Thomas further testified that he did not see FRAN before impacting her, and that he cannot say exactly where his vehicle was located when the collision occurred.
Further testifying, defendant Thomas said he was driving one car-length behind the work truck when the collision occurred, and that his vehicle was traveling no further right on the Southbound lane of the street than the work truck was. However, he acknowledged that the truck did not swerve left to miss hitting FRAN, and did not hit her. He did not explain how it happened that his vehicle hit FRAN but the truck did not. The car ahead of the truck did not hit FRAN either, he acknowledged, or swerve to miss her.
Defendant Thomas looked at his photo exhibits which he took more than three years after the accident. See Thomas Exhibits numbered 4, 5 and 6, showing damage to the car. He testified that the first impact with FRAN caused the right front blinker lens to fall off. The second impact was with the right passenger side rear view mirror. This impact broke the mirror off entirely. He did not know the actual location of the mirror on the ground after impact; someone picked it up and gave it to him, he testified.
Defendant testified that when the accident occurred FRAN was wearing a grey top and black pants. He said he did not go all the way to FRAN’S location, but did walk toward her a bit; he was holding a 2-year old child. He recalled that a group of people came to' the scene. He remembered two men in particular who came to her in the ditch where she landed.
Defendant Thomas said that he interacted with KELISE, but does not recall what she was wearing.
Defendant Thomas apparently testified at his deposition that the impact of the car with FRAN was severe. This was brought out during questioning.
In describing the actions of KELISE at the scene, Defendant Thomas stated that she was upset; she accused him of killing her mother, and was cursing him, using bad words. This was rough talk, he said; she was screaming and cursing for a few minutes initially, he said, then stopped. Then she started screaming, again without die profanity, he said. KELISE was “frantic” and engaged in “extreme behavior”, he said. •
Defendant Thomas testified that he did not see FRAN bleeding or foaming at die mouth, but when he initially saw her she was not moving; however, she later began to move, he said.
| ¿Defendant Thomas testified that a lot of police officers came to the scene. He talked with the investigating officer, but denied ever telling the officer that FRAN was walking at the edge of the road. At *962 trial, he denied apologizing to KELISE for hitting her mom. However, at deposition he apparently testified that he was apologizing the whole time.
Further testifying on examination by Attorney Wheeler, Defendant Thomas said he left home around 7:30 to' go to St. Francis Hospital to pick his wife up from work. He said he was driving about 20 miles per hour. When he made impact with FRAN, he stopped.
Defendant Thomas testified that he did not drive out of his. lane of. travel, and did not see any pedestrian- before he hit FRAN. He said there were no street lights in the area, and no shoulder; nor were there sidewalks.
Defendant Thomas then testified about the photographs he took and that were admitted in evidence as Exhibits Thomas 1-3. And he testified that he took these photographs to show that there was no shoulder, only a ditch on the side of the road next to where the impact occurred. Over objection, the Court admitted all 6 of the Thomas photographs into evidence noting that the objections would go to the weight to be given the photographs, because more than three, years had passed between the time of the accident and when he took the photographs in 2015.
Defendant Thomas next testified about KELISE coming to his vehicle and accusing him of killing her mother. However, he said she later apologized to him for cursing him.
The photograph in evidence as Exhibit Thomas 1 was then viewed by Defendant Thomas. He was asked to place an “X” at the place in the ditch where he saw FRAN after impact. This location appears to be just south of a driveway better shown on Exhibit Thomas 3. . (The . width of this driveway was not put in evidence at the trial. And the accident report, Ex. DG2, does not even show the location of this driveway in relation to the location of FRAN that is shown on the diagram.)
Defendant Thomas testified that KEL-ISE went to her mother but he does not know whether she held her hand or otherwise attended to FRAN.
Counsel next questioned Defendant Thomas about his vehicle damage, starting with Exhibit Thomas 4. Looking at this Exhibit, Defendant Thomas testified that the vehicle already was damaged, and that the impact with FRAN did not cause any more damage to the rubber bumper.
| sCounsel for State Farm next briefly questioned Defendant Thomas soliciting his statement that the work truck ahead of him did not swerve to miss hitting FRAN.
Further, the Defendant stated that he thinks FRAN and KELISE may have been on the driveway when impact occurred. However, he did not say that he knew that to be where FRAN was hit.
Pursuant to a stipulation, the Court admitted Exhibit D.G. 2, the police report, but the Court is not to consider the legal conclusions in the Supplemental Report filed about two weeks after the accident, as noted above. The Court has noted that, in the original report, the officer said he cited Defendant Thomas for driving with an expired license. Ex. DG2, page 2.
TESTIMONY OF TROY SMITH
The second witness at the trial was Plaintiff TROY SMITH, husband of Plaintiff, FRAN SMITH, and father of Plaintiff, KELISE SMITH.
TROY testified that he and his family lived on University Avenue North of the accident scene. On the night of the accident, KELISE called him and told him that her mother had been hit by a car. She was upset and frantic, he said.
*963 TROY said that he went to the scene and found his wife to be semi-conscious, foaming at the mouth; he said he tried to attend to her. He said he got to his wife a little bit before the paramedics did. When they got to her they took over caring for her. He reported that the ambulance had just arrived at the scene when he arrived, but he made it to his wife “a little bit” before they did.
TROY testified that when KELISE saw his truck she ran toward him crying, hysterically; she was “all over the place”, he said.
TROY testified that the ambulance took FRAN to the hospital and he and KEL-ISE followed, with KELISE continuing to cry and pray.
TROY testified that professional coun-selling services were not provided to KEL-ISE, because he did not have the money to pay for such services.
TROY testified that he did not talk to Defendant Thomas about the accident. He said that FRAN is not working because of a head injury arising out of the accident. He said she was in the hospital three days due to injuries she suffered in the accident.
|fiTROY testified that when he got to the accident scene, FRAN was lying on her back on a driveway; she was not in the ditch, as depicted by the “X” placed on Exhibit Thomas 1 by Defendant Thomas.
TROY testified that KELISE did not tell him details of the accident; he said she cannot talk about the accident. He said KELISE missed 1 or 2 days from school. She had been on the dance team at school at the time the accident happened, but got off the team after the accident. He said KELISE had a very good attendance record. Also, she later went back to the dance team. He said that later in the year 2012, the family moved to Texas.
TROY testified that KELISE was “not herself’ after the accident, and that continued “a good while”—even after they moved to Texas in August of 2012.
With respect to counselling for KEL-ISE, TROY testified that Rev. Alonzo Clark, a relative did counsel KELISE for a period of time. He .is not a professional counselor. TROY said that KELISE was in “shock” and did not want to do anything. He asked Rev. Clark to counsel, with KELISE,'he testified. '
At the beginning of trial, the parties stipulated that if Rev. Clark were called to testify hé would say that he counselled KELISE, and that she was “not the same” after the accident.'
TESTIMONY OF FRAN SMITH
FRAN testified that the family lives in Grand Prairie, Texas. She testified that on February 19, 2012, she was struck by a car, as she and KELISE were walking south on the shoulder of University Avenue, after church that evening. She said that they always walked with KELISE in front of her, and that is how they were walking that night.
FRAN testified that she was not walking in the roadway. According to her, she was wearing walking shoes with reflectors, black sweat pants, and a light colored gray sweatshirt. She said KELISE walked in front of her for her protection.
FRAN testified that she does not recall being hit by the car. She testified that before the accident she called KELISE her “perfect child.” However, after the accident she observed that KELISE’S behavior at home was different; the “sparkle” was gone, and she wanted to be by herself in her room. She did not want to be active. She felt that KELISE was “shutting down”.
*964 FRAN testified that when she got home from the hospital after the accident, KEL-ISE could not talk about the accident. She said KELISE would have nightmares and a lot of nights she would sleep with KEL-ISE. KELISE’S older sister sometimes slept with her as well.
|7On further examination by Attorney Wheeler on behalf of Defendant Thomas, FRAN testified that she did not recall getting hit by the car. She did remember, she testified, that she was walking in the grass and gravel next to the right side of the road when she got hit, she said.
FRAN testified that KELISE missed one day from school, and her grades did not drop; they remained A’s and B’s for the remainder of the 8th grade school year.
FRAN testified that KELISE did not dance her 9th grade school year while attending school in Texas.
FRAN further testified that KELISE did not receive professional counselling. She said the family worked to help her cope.
FRAN testified that, before the accident, she worked as the traffic manager at KTVE.
DISCUSSION
The Court will now address the fault issue raised and strongly argued on behalf of Defendant Thomas. The stacking concern raised by Direct General is rendered moot because of the decision in this matter. The Court will cast only Defendant Thomas in judgment, and he has insurance coverage by State Farm under the provisions of the policy providing coverage to an additional person injured in the same accident, whose claim is not derivative, as would be the case with a consortium claim.
The evidence related to the fault issue is in conflict. In his accident report, which is in evidence as Exhibit D.G. 2, me investigating officer wrote that he interviewed Defendant Thomas about the accident. See Exhibit D.G. 2.
In relevant part the officer wrote in the report completed on February 19, 2012, the following:
Driver of Vehicle 1 stated he was Southbound on University when pedestrian 1 suddenly appeared walking Southbound on the edge of the roadway. Driver stated that he then struck the pedestrian.
This statement differs from the testimony given by Defendant Thomas at the trial of the case, as reported in detail above, where he says he did not see FRAN before he struck her with the car he was driving. At trial, he testified that he was travelling one car length behind a work truck, which did not swerve to the left to miss hitting FRAN, yet admits that her body made contact with his car in two locations. How could that happen? How did the work truck miss her while he struck her? While the width of the Toyota Camry Defendant was driving was not put in evidence, nor was the width of the work truck, Defendant was too closely following, clearly, to | shave struck FRAN, he had to have been driving to the right of the path of the truck by some distance toward the right side of the street, west of the fog line.
The liability claims made by FRAN and her husband TROY were settled by STATE FARM, reserving the Lejeune claim made on behalf of their minor daughter, KELISE.
Before addressing the claim made on behalf of KELISE, now an adult, the Court finds by a preponderance of the evidence that Defendant Thomas is liable for the accident in which her mother was injured. FRAN and KELISE testified that they were walking on the grass and gravel on the side of the road and the Court *965 accepts and credits their testimony. The evidence consisted of the testimony of Defendant Thomas, and KELISE, FRAN and TROY, along with the accident report, and photographic evidence in the form of Exhibits. The State Farm policy and other exhibits were also considered.
On Exhibit Thomas 1, Defendant placed an “X” at the place where he said he saw FRAN in the ditch following impact. This mark is just south of a driveway. TROY testified that when he got to the scene, he found his wife lying on a driveway on her back. If credited, and the Court does, this would be consistent with FRAN being hit on or near this driveway. The photographs taken that are in evidence were all taken more than three years after the accident, and are unreliable on the question of how much walking space FRAN and KELISE had between the paved portion of the street West of the fog line and the ditch on February 19, 2012. The street could have been overlaid and widened, the ditch could have been dredged, or both. The Court credits the testimony by FRAN and KEL-ISE (though not the photograph that KELISE placed in evidence) to the effect that they had sufficient room to walk without walking out in the street on February 19, 2012.
Defendant testified that he does not know where FRAN was located at the time of impact, but appeared, under examination by Attorney Breithaupt on behalf of KELISE, to say that he thinks FRAN and KELISE may have been on the driveway at impact. He says he does not know where FRAN was walking when he hit her. This testimony does not contradict the testimony of FRAN and KELISE, so on this issue the Court only has the testimony of the victims.
Defendant Thomas’ testimony that FRAN’S body struck or was struck by his car in two places, breaking a light cover at the front and completely breaking off the right side view mirror shows that she suffered substantial trauma to her body. And it would seem that trauma was suffered in two places, her lower body and her upper body. With respect to the upper body | fltrauma, that impact must have broken the mirror all the way off, according to what the Defendant’s testimony was. (This 2000 Canary must not have been equipped with a collapsible mirror).
THE LAW TO BE APPLIED
While KELISE was “involved” in this accident, she was not struck physically by the car that hit her mother, FRAN. She was a 14-year old 8th grade student, who, according to the testimony, had a close relationship with her mother.
Prior to the Louisiana Supreme Court decision in Lejeune vs. Rayne Branch Hospital, 556 So.2d 559 (La. 1990), so called bystander injury claims were not recognized. In that case, a wife sued Rayne Hospital where her comatose husband was being cared for after she visited him and found that he had been bitten several times by rats. She did not see a rat bite her husband. Her claim was that she suffered mental anguish and pain from viewing her husband’s injuries.
The Defendant hospital’s Exception of No Cause of Action was overruled and the wife’s suit for her mental anguish damages was allowed to proceed.
In 1991, the Legislature passed an act that became Civil Code Art. 2315.6. That article provided that persons who had a defined close relationship with a tort victim could recover damages for emotional or mental pain and anguish provided certain requirements were met. This kind of claim has come to be called a Lejeune claim.
*966 In order for a person to recover for mental anguish or emotional distress on a Lejmne claim, the plaintiff has to be related in the degrees recorded in C.C. Art. 2315.6 (1)(2)(3) or (4). A child enjoys a qualifying relationship, so KELISE is authorized to maintain this type of claim, provided the remaining requirements are met
The next requirement is that the Plaintiff must either see their near-kin get injured or come upon the scene where the injury-causing event occurred soon after. And that which the Lejmne' Plaintiff sees has to be a traumatic event that causes immediate shock due to the direct victim’s severe and apparent harm.
Next, the law requires that the direct victim must “suffer such harm that one can reasonably expect a person in the claimant’s position to suffer serious mental anguish or emotional distress from the experience. [C.C. 2315.6 B.] And the Plaintiff must prove that her mental anguish or emotional distress is or was severe, debilitating, and foreseeable.
11ftKELISE was a 14-year old when she experienced her mother get hit by a car and caused to fly through the air some distance away and land in a ditch along the side of University Avenue, where the two of them had been walking, as was their custom. The evidence shows that she went to her mother, who was not conscious and moving, something was apparently coming out of her mother’s mouth, and she was groaning. KELISE was shocked and greatly upset; she believed that her mother had been killed; she was crying and cursing the driver, telling him he had killed her mother. Defendant Thomas’ tesr timony shows that KELISE was extremely upset and emotional. She immediately processed the seriousness of her mother’s injury, and reacted in a way that is foreseeable that a child would react to the killing of her mother. She thought her beloved mother had been killed. Even at the time of trial, approximately 4 years later, there was testimony that well after the accident she could not talk about it.
Marshalling and crediting all testimony recorded above that is supportive of these findings, the Court finds that the elements of severity, and foreseeability have been met.
The more difficult question is whether the child was debilitated by reason of observing her mother get hit by a car and suffer injury that she thought was “unto death”,
The evidence showed that KELISE only missed one day from school. The accident occurred on Sunday, February 19, 2012, so she missed school on Monday, February 20. Her grades remained A’s and B’s for the school year.
But the testimony showed that KELISE stopped dancing. This was a school-related activity that she was participating in at the time. She did not dance the next school year after the family moved to Texas. But the Court cannot relate that fact solely to the accident involved here.
Testimony showed that she had bad dreams every night for a while after the accident and her mother and older sister sometimes slept with her. She continued to fear that her mother would or might die, even after her mother got out of the hospital and was recovering.
KELISE testified that she is more protective of her mother now. She said the accident in which her mother was injured is the most traumatic event she has ever experienced.
The evidence showed that KELISE did not attend counselling with a professional. Her father testified that they could not afford professional counselling. Instead, *967 Rev. Lonzo Clark, a relative, talked with KELISE for a number of months, even after they moved to Texas. Rev. Clark is not a professional counsellor.
InTo what degree does a child have to be disabled by reason of observing her mother get hit by a car and seriously injured, and for how long must any such disability last for such a bystander to be eligible to recover damages? The Court charges itself that damages, like liability, must be proved by a preponderance of the evidence.
In the case of a child, how is disability expressed? Does a change in activities or in relating socially, express disability? The testimony from credible people was that she was “not the same”; she was more reserved, did not want to be active, just wanted to stay in her room, and became more distant. All of these statements were offered to show that the accident changed KELISE; it impacted her seriously. She suffered mental anguish and emotional distress.
The testimony the Court has heard and credited convinces the Court that KEL-ISE experienced some change in activities and behavior, by reason of the accident in which her mother was the direct victim. But the Court believes KELISE can be considered a victim, as well. For, in a real way, she was also “involved” in this accident. She was there on the scene and saw and heard what happened, and reacted to this trauma by crying, screaming, cursing, and being out of control. She initially suffered mental and emotional distress at a high level and even later suffered some level of disability.
However, absent objective, credible, supportive, professional testimony, it is often unwise to fully credit subjective testimony and give full weight to claims of disability for an extended period of time.
Considering the above analysis, the Court finds that KELISE did suffer disabling mental and emotional distress to a degree that is compensable.
The Court has considered the cases provided for study. The case that the Court finds most helpful is Crabtree vs. State Farm Insurance Company, 632 So. 2d 736 (La. 1994). There the Court discussed at length State Farm policy language that seeks to restrict coverage for such claims as loss of consortium to recovery out of the per person limit in the policy, by considering such claims as derivative.
While the Court had a chance to consider Lejeune claims to be derivative also, it did not do so. Indeed, the opinion left open the possibility of considering the physical effects of extreme trauma such as this child experienced, evidenced by her screaming, crying, cursing and acting uncharacteristically, to qualify her to recover under the policy provision providing coverage that protects any other person involved in the same accident.
haThe State Farm policy in evidence as Exhibit S.F. 2 provides liability coverage in the amount of $15,000.00 per person/$30,000.00 per accident. The Court is informed by Exhibit S.F. 1 that State Farm has paid the full per person policy limit of $15,000.00 per person to settle FRAN’S injury claim and any loss of consortium claims TROY had. If Lejeune claims are considered derivative claims, like loss of consortium claims, then the promise of recovery will be illusory in a high percentage of Lejeune cases, because the $15,000.00 per person limit will often be exhausted in payment to the direct victim. The discussion in Crabtree, at pages 744-745 suggests to this Court that the Supreme Court is not prepared to rule that Lejeune claims are derivative. This Court does not think that they are.
*968 It is this Court’s opinion that KELISE should have access to up to $15,000.00 of the $30,000.00 per accident policy provision. Moreover, the Court finds that KELISE was, in a very meaningful way, involved in this accident and suffered physical effects from the extreme trauma she personally received. In Crabtree, at page 745, the Court says “There is no bright-line distinction between physical and mental injuries either in medicine or in law.”
CONCLUSION
The Court has considered all the evidence presented and the arguments of counsel in briefs, and finds that ROBERT THOMAS, alone, is liable to KELISE, and STATE FARM is ordered to pay to her the sum of $12,000.00, plus interest and all costs of this proceeding. Any and all remaining claims are dismissed.
Monroe, Louisiana, this 6th day of January, 2016.
/s/
BENJAMIN JONES
JUDGE PRO TEMPORE

. Lejeune v. Rayne Branch Hosp., 556 So.2d 559 (La. 1990). See also La. C.C. 2315.6.

. Officer Varnell did not testify at trial; his report of the incident was entered into evidence upon the joint stipulation of the parties.

. In July 2014, Fran and Troy Smith also dismissed their claims against Financial and Direct General but reserved Kelise’s claims against those defendants. In August 2014, all plaintiffs dismissed their claims against Cheryl Huey.

. The writ denial has no precedential value for this appeal.

. The court had the benefit of a number of photos of the scene near the accident depicting the road, the shoulder area, and various manmade features near the accident scene, and the witnesses identified various locations on the photos according to their memory of the event.

. B. Where sidewalks are not provided, any pedestrian walking along and upon a highway shall, when practicable, walk only on the left side of the highway or its shoulder, facing traffic which may approach from the opposite direction.

. Her suit was filed on behalf of herself, in her capacity as natural tutrix of the couple's three minor children, and as administratrix of her husband’s succession.